<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAJOECO LLC; NORMAN MAIS, individually, as Trustee, Administrator and Beneficiary of Cajoeco LLC Profit Sharing Trust; CARMEN MAIS, individually and as Trustee and Beneficiary of Cajoeco LLC Profit Sharing Trust,<br><br>*Plaintiffs*,<br><br>v.<br><br>BENEFIT PLANS ADMINISTRATION SERVICES, INC.; CONSULTING ACTUARIES INTERNATIONAL, INC.; HARBRIDGE CONSULTING GROUP; JEFFREY SCHREIBER, E.A., INDIVIDUALLY AND AS PRINCIPAL, AGENT AND/OR SERVANT OF BENEFIT PLANS ADMINISTRATION SERVICES, INC., AS PRINCIPAL, AGENT AND/OR SERVANT OF CONSULTING ACTUARIES INTERNATIONAL, INC., AND AS PRINCIPAL, AGENT AND/OR SERVANT OF HARBRIDGE CONSULTING GROUP; ABC ENTITY(IES) NO. 1 THROUGH 100, A FICTITIOUSLY NAMED BUSINESS ENTITY(IES); AND JOHN DOE NO. 1 THROUGH 100, A FICTITIOUSLY NAMED INDIVIDUAL(S),<br><br>*Defendants*. | Civil No.: 17-cv-07551 (KSH) (JSA)<br><br><br><br><u>OPINION</u> |

**Katharine S. Hayden, U.S.D.J.**

    **I.**    **Introduction**

        Plaintiffs Cajoeco LLC ("Cajoeco"), Norman Mais ("Mais"), and Carmen Mais ("Carmen," and together with Cajoeco and Mais, "plaintiffs") are suing defendants for breach of fiduciary duty in connection with a retirement plan Mais instituted in 2007. They allege that

1

defendants were fiduciaries under the Employee Retirement Income Security Act of 1974 ("ERISA") and failed to perform as required, and that they provided investment advice that Mais relied on to his detriment. Plaintiffs originally filed in state court but on defendants' motion, the trial court determined that the case was preempted by ERISA and dismissed it. That ruling was affirmed on appeal. *Cajoeco, LLC v. Benefit Plans Administration Services, Inc.*, 2019 WL 1849299 (App. Div. 2019) (per curiam).

Before the Court now is defendants' motion for summary judgment (D.E. 67), arguing that dismissal of this lawsuit is appropriate on grounds that: (i) they are not ERISA "fiduciaries"; and (ii) even if they are, the breach of fiduciary duty claim against them fails as a matter of law because Section 404(c) of ERISA exempts participant-directed investments. The record before the Court consists of documents related to the Cajoeco Plan (defined below), emails exchanged between the plaintiffs and defendant Jeffrey Schreiber, the depositions of Schreiber and David Klein, and the statements of Mais and Gary Young, Esq. In addition, the parties have submitted supplemental statements of material fact. The Court held oral argument on the motion at which counsel advised of other relevant facts as indicated below.

## II. Factual Background

### a. The Parties

Norman Mais is a retired small business owner, and his wife Carmen had been an employee of his businesses. (D.E. 67-3, Defs. R. 56.1 Stmt. ¶¶ 1, 3.) Defendants Benefit Plans Administration Services, Inc. and Harbridge Consulting Group (together, "BPAS") and Consulting Actuaries International, Inc. ("CAI Benefits") provided retirement plan administration services for Norman and Carmen Mais, including plan documents preparation, recordkeeping, and actuarial services. (D.E. 1, Compl. ¶¶ 4-5.) Jeffrey Schreiber is an enrolled

actuary authorized to perform actuarial services for plans subject to ERISA. (Defs. R. 56.1 Stmt. ¶ 6.) Schreiber was previously employed by CAI Benefits and BPAS and provided certain administrative services to plaintiffs' pension plans. (*Id.* ¶¶ 7-8.) David Klein, who is not a named defendant in this action, assisted Schreiber. (D.E. 68-4, Klein Dep. 59:9-22.)

### b. The Jest Plan

From the 1970s until late 2007, Mais operated a textile business known as Jest Textile, Inc. ("Jest"). (D.E. 68-1, Mais Decl. ¶ 2.) Jest sponsored a benefit pension plan known as the Jest Textiles, Inc. Defined Benefit Pension Plan (the "Jest Plan"), which was required under ERISA to engage the services of an enrolled actuary. (Defs. R. 56.1 Stmt. ¶¶ 5, 9.) Schreiber, an enrolled actuary working for CAI Benefits at the time, provided actuarial services for the Jest Plan. (*Id.* ¶ 9.) According to Schreiber's deposition testimony, his services to the Jest Plan included:

> [Providing] [r]eports. Providing participants with statements of their benefits, benefit rights. Preparing legal documents that the plan would need in order to remain qualified. Preparing annual filings to the Pension Benefit Guaranty Corporation in which the company paid a premium, so that their pensions would be insured by the federal government. Preparing Form 5500 of that report, the annual report for the plan, which stated things like assets of the trust, income, expenses. And I signed an actuarial certification Schedule B detailing the liabilities, the required contributions of the plan, and listing the amounts that the employer did contribute and determining whether they had met their funding requirement, or if they exceeded it, by how much.

(D.E. 68-3, Schreiber Dep. 22:22-23:11.) The Jest Plan also engaged Merrill Lynch as its investment manager pursuant to ERISA Section 3(38) with discretion to manage marketable securities and cash held in the Jest Plan's account. (D.E. 68-14, Pl. Supp. R. 56.1 Stmt. ¶ 11.)

In 2003 or 2004, Mais contacted Schreiber about his interest in investing in a friend's restaurant venture, Bensi Restaurants ("Bensi"). (Mais Decl. ¶ 6.) Schreiber told him that the Jest Plan was permitted to invest in Bensi by using plan funds allocated to Mais's account but not plan funds that were allocated to other employees. (Schreiber Dep. 25:23-26:5.) The Jest

3

Plan made a series of investments in Bensi between 2004 and 2006, using Mais's allocated funds. (Mais Decl. ¶ 9.) In 2006, Mais decided to close Jest, and reached out to Schreiber about terminating the Jest Plan. (Pl. Supp. R. 56.1 Stmt. ¶ 18; Mais Decl. ¶¶ 11-12.) Schreiber stated that Mais could adopt a new plan that could accept rollovers and transfers. (Schreiber Dep. 63:10-12.) Accordingly, Schreiber prepared the necessary filings, and the Jest Plan was terminated. (*Id.* 61:17-19.)

      c. **The Cajoeco Plan**

After Jest and the Jest Plan were terminated, Mais established Cajoeco LLC, a small company formed to sell athletic tape. (Mais Decl. ¶ 11.) In 2007, defendants drafted documents to establish the Cajoeco LLC Profit Sharing Plan and Trust (the "Cajoeco Plan," and together with the Jest Plan, the "Plans"). (Pl. Supp. R. 56.1 Stmt. ¶ 22.) Defendants continued to provide plan administration services for the Cajoeco Plan, including preparing Form 5500s and annual reports that reflected values for the Bensi investments. (*Id.* ¶ 23.) Mais made additional investments from Cajoeco Plan funds to Bensi over the next several years, advising defendants of each investment. (*Id.* ¶¶ 24, 26-27.) In March of 2012, Mais's daughter, who with Mais and Carmen was one of the three plan participants, withdrew her distributions from the Cajoeco Plan, leaving only Mais and Carmen as participants. (*Id.* ¶ 30.)

In 2014, Mais began consulting with Gary Young, Esq. in connection with a proposed loan transaction for Cajoeco. (*Id.* ¶ 46.) Young told Mais that there were operational failures related to the administration of the Jest Plan and the Cajoeco Plan (something that defendants dispute). (D.E. 68-10, Young Cert. ¶ 4; *compare* Pl. Supp. R. 56.1 Stmt. ¶ 47 *with* D.E. 69-2, Defs. Resp. to Pl. Supp. Stmt. ¶ 47.) On Mais's behalf, Young submitted an inquiry to an anonymous IRS program (the "Voluntary Correction Program") to determine whether the IRS

4

would approve a proposal for curing the Cajoeco Plan's operational defects. (Young Cert. ¶ 5; D.E. 74, OA Tr. 32:23-25.) According to plaintiffs' counsel, the Voluntary Correction Program is designed as a way for entities to correct any tax issues before being audited, with hopes of more leniency. (OA Tr. 33:17-20.) The agency responded that its program was not appropriate for correcting the purported errors. (Young Cert. ¶ 5; *see* D.E. 68-7.) At oral argument, the parties advised the Court that to date, the IRS has not yet imposed any penalties or initiated any audits against the Plans on account of the errors Young identified. (OA Tr. 12:17-19.)

### III. Procedural History

Plaintiffs' litigation against these defendants has taken more than one bounce since its initial filing in state court. There, defendants sought (and won) dismissal on the basis that the federal courts had exclusive jurisdiction over the subject matter based on ERISA preemption. Plaintiffs filed this suit in federal court alleging ERISA violations, and defendants seek dismissal again, arguing this time that ERISA fiduciary obligations do not apply.

Specifically, on April 7, 2016, plaintiffs sued in Bergen County Superior Court alleging "professional negligence, breach of contract, breach of the covenant of good faith and fair dealing, and negligent infliction of emotional distress relating to the services provided by [d]efendants in connection with the investments by the [Plans] in Bensi." (D.E. 68, Opp. Br. at 16.) Following the Appellate Division's affirmance of the trial court's dismissal, plaintiffs commenced the instant lawsuit seeking indemnification or contribution from defendants for breach of their ERISA fiduciary duties. (D.E. 1.) Defendants answered, denying that they owed any fiduciary duties to the Plans, and asserted a counterclaim on grounds that plaintiffs are plan fiduciaries and negligently invested plan assets. (D.E. 13.)

On December 28, 2018, defendants filed for summary judgment. (D.E. 26.) The parties engaged in settlement conferences over the next several months, and in aid of that, the matter was administratively terminated on September 6, 2019. (D.E. 50.) After settlement efforts failed, the case was reopened and the parties engaged in further discovery until defendants renewed their motion, the subject of this opinion. (D.E. 67.)

## IV. Discussion

### a. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The moving party has the burden of establishing the non-existence of a "genuine issue" for purposes of summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). This burden can be satisfied either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the moving party meets its burden, it is the nonmoving party's burden to "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The nonmovant "may not

rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

### b. Defendants' Motion for Summary Judgment

Defendants argue that summary judgment is appropriate because (i) their services were not fiduciary in nature; and (ii) even if they were, the Bensi investments were self-directed by Norman Mais as an administrator and trustee of the Plans out of his segregated accounts, thereby precluding a breach of fiduciary duty claim under 29 U.S.C. § 1104(c).[1] A finding in defendants' favor on the former argument—which is where the bulk of oral argument rested— obviates the need to address the latter.

### i. Were Defendants' Services Fiduciary in Nature?

ERISA describes two types of plan fiduciaries: (1) persons or entities named in the plan documents, "named fiduciaries" (not the case here); and (2) entities that are fiduciaries by virtue of services they perform for the plan, or "functional fiduciaries." *In re Lehman Bros.*, 683 F. Supp. 2d 294, 298-99 (S.D.N.Y. 2010). ERISA identifies three ways an entity can gain functional fiduciary status, namely if:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has

---

[1] Defendants also argued in their briefing that the Cajoeco Plan was not an "employee benefit plan" within the meaning of 29 U.S.C. § 1003(a) and 29 C.F.R. § 2510.3-3(b) at the time of the Bensi investments because no "employees" were plan participants—an argument they abandoned on the record during oral argument. (*See* D.E. 67, Mov. Br. at 16-19 and D.E. 69, Reply Br. at 4-5; *see also* OA Tr. 28:16-18 ("What I also am telling you, arguing to you, Your Honor, is this is an ERISA plan. It is, but we are not fiduciaries of the plan.").) Accordingly, the Court need not address that argument.

7

> any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

### 1. Exercising Discretionary Control and Authority or Responsibility Over the Plan under Prongs (i) and (iii)

Defendants argue that they held a limited, non-discretionary role with respect to the Plans, and that their services were ministerial functions that the Department of Labor ("DOL") and the Third Circuit have found to be non-fiduciary activities. (*See* Mov. Br. at 31-34.) Defendants call the Court's attention to two interpretive bulletins regarding ERISA fiduciaries issued by the DOL, which is "the agency charged by statute with the interpretation of ERISA," and thus is owed "substantial deference to its views." *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1150-51 (3d Cir. 1989). First, "attorneys, accountants, actuaries and consultants performing their usual professional functions will ordinarily not be considered fiduciaries." 29 C.F.R. § 2509.75-5, D-1. Second, "[p]reparation of reports required by government agencies"; "advising participants of their rights and options under the plan"; and "[m]aking recommendations to others for decisions with respect to plan administration" are deemed to be "purely ministerial functions" that do not confer fiduciary status *unless* persons or entities performing these functions have additional discretionary authority or control over the plan. 29 C.F.R. § 2509.75-8, D-2. The Third Circuit has noted Congress's commentary on fiduciary status in that context:

> While the ordinary functions of consultants and advisors to [plans] may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisors may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of [a plan] or some authority or control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

8

*Painters*, 879 F.2d at 1150 (quoting Joint Explanatory Statement of The Committee of Conference p. 323, *reprinted in 3 Legislative History of The Employee Retirement Income Security Act of 1974* at 4590).

Defendants maintain that their services fall under the ministerial services category identified by the DOL.  Relying on cases where courts found that consultants and advisors had "assumed fiduciary obligations within the meaning of the applicable definition" (Opp. Br. at 32), plaintiffs argue that defendants acted as "*de facto*" plan administrators under prongs (i) and (iii) of 29 U.S.C. § 1002(21)(A) by exerting discretionary control and responsibility over management of the Plans through their services, "including the preparation of the annual Form 5500s, the preparation of the valuation reports for the Plans in accordance with accepted procedures, the communications with participants, the establishment of theoretical accounts to hold the Bensi investments within segregated accounts of the Plans, and the overall administration of the Plans." (*Id.* at 21-22.)  The Court disagrees: most of these services fall squarely within the ministerial functions the DOL has expressly stated are non-fiduciary; the Form 5500s and valuation forms are reports required by government agencies, and the relevant communications between defendants and Mais are technical in nature.  Insofar as defendants established segregated accounts to hold the Bensi investments, the circumstances of those investments (more fully discussed *infra*) show that Schreiber advised Mais of his "rights and options under the plan" and took the steps required for Mais to invest money from the Plans into his friend's restaurants.  Thus, the Court is satisfied that defendants were not performing discretionary acts in creating the segregated accounts and that those services are "ministerial" for purposes of this analysis.  The focus becomes whether this record supports a finding of

9

discretionary authority or control on defendants' part that would transform them into "functional fiduciaries."

On this point, plaintiffs argue that defendants qualified as fiduciaries "because they served as the *de facto* plan administrators of the Plans." (Opp Br. at 32.) They cite cases that held various professionals—insurance brokers, stock traders, attorneys—to be fiduciaries. For example, in *Reich v. McManus*, 883 F. Supp. 1144, 1149 (N.D. Ill. 1995), the trial court found that insurance brokers assumed fiduciary status where they were the plan's sole financial consultant, and the plaintiffs asserted that they "relied exclusively on defendants' investment advice and that most (if not all) of their plans' funds were placed in investments recommended by defendants."

As the *Reich* court stated, "[t]he question of whether a person has demonstrated actual authority over a plan is highly factual in nature." *Id.* In an earlier lawsuit Mais brought against the owners of Bensi for alleged fraud,[2] he claimed that John Osso and Rick Osso, the Bensi owners, misled him into making the investments. *See Cajoeco v. Bensi Enterprises, LLC*, 2019 WL 5459808, at *1 (Law Div. 2019) ("*Cajoeco I*"). Mais's position that he was duped into making the Bensi investments by individuals unrelated to defendants in this lawsuit is a consequential difference that makes *Reich* inapposite.

For the same reasons, the other cases plaintiffs cite are unpersuasive based on their facts. *See Stanton v. Shearson Lehman/American Exp., Inc.*, 631 F. Supp. 100, 103 (N.D. Ga. 1986)

---

[2] In 2018, plaintiffs, along with the Cajoeco Plan, the Cajoeco Trust, Jest, the Jest Plan, and Mais and Carmen on behalf of the Cajoeco and Jest entities, initiated a state court action in Bergen County against the majority owner of the Bensi groups along with over 50 individual co-investors and entities, asserting causes of actions for, *inter alia*, fraud, breach of good faith, unjust enrichment, negligence, and conspiracy. In March 2019, the trial court granted summary judgment in favor of the defendants. *Cajoeco I,* 2019 WL 5459808, at *22. This state court action is discussed further on pages 16 through 18, *infra*.

(finding fiduciary obligations where defendant effected trades on plans' behalf based on his own recommendations, and plaintiffs merely "rubber stamp[ed]" such investment recommendations); *see also Carpenters' Local Union No. 964 Pension Fund v. Silverman*, 1995 WL 378539, at *3 (S.D.N.Y. June 26, 1995) (finding fiduciary obligations where attorneys represented to plaintiffs that they had specific expertise regarding investments and provided input on the plan's investments).

Defendants argue instead that they were third-party administrators ("TPAs") (as distinguished from plan administrators) who were performing functions that were purely ministerial. (Mov. Br. at 33-34.) They rely on *Confer v. Custom Engineering Co.*, 952 F.2d 34, 35, 38 (3d Cir. 1991), where the Third Circuit found that a TPA who handled the "day-to-day administrative duties" of the plaintiff pension plan, including "drafting a new plan, handling claims, and arranging for excess insurance," was not a fiduciary under ERISA. There, the TPA "had an obligation to follow the written plan instrument and to follow instructions of the administrator. Even if an officer of [the defendant] knew something was awry, [he or she] had no power to correct it." *Id.* at 39. Based on those facts, the court found that the plaintiff failed to demonstrate that the defendant TPA exercised any discretionary authority or responsibility over the administration of the pension plan. *Id. Confer* is in sharp contrast with *Board of Trustees of Bricklayers and Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Associates, Inc.*, 237 F.3d 270, 275 (3d Cir. 2001), where the Third Circuit held that the plaintiff pension plan's ERISA claims could survive summary judgment where the TPA had a high degree of responsibility and discretion delegated to it under its contract with the plaintiff.

At oral argument, plaintiffs' counsel described defendants' activities as "cross[ing] the line" by using "discretion" in valuing the Plans' assets (OA Tr. 40:3-17), and "exercis[ing]

11

control over plan assets" in segregating accounts "so that it was the Mais' money that was going to the Bensi investments" (*id.* 36:11-14). It is undisputed that defendants used valuations provided by Mais's accountant for purposes of filling out annual reports. (Pl. Supp. R. 56.1 Stmt. ¶ 32; Defs. Resp. to Pl. Supp. Stmt. ¶ 32.) Plaintiffs contend that Schreiber "knew market values should be used in completing the Form 5500s, but instead used the information from the K-1s, which they knew was the book value of the investments." (Opp. Br. at 22, n. 7.) The Court is not persuaded that making this choice of values for reporting purposes demonstrates that defendants had discretion or control over administration of the Plans or management of assets.

Above all, the undisputed factual context for the Bensi investments is Norman Mais's desire to use plan assets for investing in his friend's restaurant chain. Enabling this decision on Mais's part by segregating accounts in the Jest Plan and then the Cajoeco Plan was not an act of discretion or control by defendants. Plaintiffs have not established or argued that defendants chose to make the Bensi investments and decided to segregate plan accounts accordingly. The facts reflect that Mais asked Schreiber if he could use Plan assets to invest in Bensi, and Schreiber advised Mais that the funds in the plan attributable to him should be the source for the investments and then took the necessary steps. Further distancing defendants from authority over the Bensi investments, counsel confirmed at oral argument that plaintiffs are not claiming defendants are responsible for the losses after the investments failed. (OA Tr. 49:10-12.) This record shows that as to the Bensi investments, all "discretion" and "control" belonged to Mais as the trustee and administrator of the Plans, he exercised both in deciding to invest, and Schreiber took the required ministerial steps. Thus, the Court finds that the evidence does not establish that defendants exercised discretionary responsibility or control over the Plans, and moves to the

12

second prong of the test: whether they rendered investment advice so as to assume fiduciary status.

### 2. Rendering Investment Advice

According to the five-factor test DOL has put forth, an entity is an investment advice fiduciary if it:

> [1] render[ed] advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property . . . [2] on a regular basis . . . [3] pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, [4] that such services will serve as a primary basis for investment decisions with respect to plan assets, and [5] that such person will render individualized investment advice to the plan based on the particular needs of the plan.

29 C.F.R. § 2510.3-21(c)(1). "All five factors are necessary to support a finding of fiduciary status." *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 297 (3d Cir. 2014) (quoting *Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1117 (9th Cir. 1994)).

Mais and Carmen are the trustees of the Cajoeco trust and administrators of the Cajoeco Plan. (Defs. R. 56.1 Stmt. ¶¶ 21, 23.) Section 2.1 of the trust agreement of the Cajoeco Plan states:

> Responsibility for Investment. If authorized by the Plan, the Trustee shall from time to time purchase policies in accordance with the Plan and pay the premiums from the Trust Fund. The Trustee shall invest the balance of the Trust Fund in such property as the Trustee, in its discretion, shall deem advisable, subject to any instructions by the Administrator or an investment manager or a Participant as to the investment of all or a portion of the Trust Fund pursuant to section 2.2.

(D.E. 26-7 ¶ 2.1.) Moreover, the Cajoeco Plan documents provide:

> From time to time the Administrator may divide the Trust Fund into two or more separate funds having different investment objectives and policies in order to permit the Participants to allocate their Accounts among the separate funds in accordance

13

with their individual preferences.

(D.E. 26-6 ¶ 7.3.) They further provide that the "Trustee shall have full responsibility for the investment of the Trust Fund[.]" (*Id.* ¶ 7.2.). This plan language indicates that Norman and Carmen Mais in their Trustee and Administrator roles have responsibility over investments and can create separate accounts to make investments according to their preferences.

Mais became interested in investing in a friend's restaurant venture, Bensi, and reached out to Schreiber regarding whether it was permissible for the Jest Plan to invest. (Mais Decl. ¶ 6.) In response, Schreiber advised that the Jest Plan could make the investment if Mais used funds allocated to himself. (*Id.* ¶ 7.) In Schreiber's deposition, he testified to the following:

> Q. When you indicated that you insisted that Mr. Mais use money from the rollover account to invest in the restaurant -- the Bensi investments, when did that happen, when did you insist that he do that?
>
> A. When he indicated that he wanted to invest in restaurant partnerships.
>
> Q. And why did you insist that he use the rollover account?
>
> A. Because for several reasons. I didn't think it was a prudent investment for a pension plan.
>
> Q. Did you tell him you believed it was not a prudent investment for a pension plan?
>
> A. I don't know if I used the word "prudent."
>
> Q. Do you remember what word you may have used?
>
> A. Perhaps improper.
>
> Q. You say "perhaps." Do you remember using the word improper?
>
> A. No, I don't. I just insisted that he didn't do that.

(Schreiber Dep. 27:6-28-2.)

The record does not reflect other evidence that defendants rendered opinions about the Bensi investments beyond what Schreiber described, let alone that they provided investment advice on a "regular basis." After Mais began investing in Bensi, defendants continued to provide their regular ministerial services, including preparing plan documents, tax filings, and annual reports. (Pl. Supp. R. 56.1 Stmt. ¶ 23.) Mais informed defendants about the Bensi investments he was making and, on one occasion, did so *after* he made them. (*See* D.E. 26-16; *see also* D.E. 26-17.) That Mais learned of the Bensi investment opportunity on his own and continued to invest without meaningful consultations with defendants are circumstances that easily demonstrate defendants' input was not the "primary basis" for making the investments.

Plaintiffs argue in this lawsuit that defendants regularly advised Mais about the Bensi investments, "including additional investments by the Jest Plan and Cajoeco Plans in Bensi, how to invest the roll-over assets from the Jest Plan, how to segregate accounts of the Jest Plan and the Cajoeco Plan to hold the Bensi investments, and what to do with returns from the Bensi investments." (Opp. Br. at 28.) These services may be characterized as ministerial inasmuch as defendants were "advising participants of their rights and options under the plan," and "[m]aking recommendations to others for decisions with respect to plan administration." 29 C.F.R. § 2509.75-8, D-2. The Court has already found that merely telling Mais his segregated accounts must be the source of funding the investments is not discretionary or a show of authority. Plaintiffs claim Schreiber regularly gave them advice each time the Bensi investments were made, and that they relied on defendants as their "primary source for information about whether the plans could invest in [] Bensi." (Opp. Br. at 28-29.) But the record facts do not support the assertion of reliance or receiving regular advice from Schreiber—in fact as discussed above, the

15

record shows just the opposite.  What plaintiffs have shown is that defendants advised about *how* to invest in Bensi, which does not equate to the choice or "advisability" of investing in Bensi.

Finally, federal plaintiffs Norman and Carmen Mais bear little resemblance to how the Appellate Division described them in affirming in full the trial court's dismissal of Mais's lawsuit against the Bensi people and entities at the summary judgment stage (referenced in footnote 1, *supra*).  *See Cajoeco v. Bensi Enterprises, LLC*, 2021 WL 2472382 (App. Div. 2021) ("*Cajoeco II*").  According to *Cajoeco II*,

> Plaintiffs, Norman and Carmen Mais, are spouses, former owners of plaintiff Jest Textiles, Inc. (Jest), the current owners of plaintiff Cajoeco, LLC (Cajoeco), and the administrators and beneficiaries of the two companies' retirement and profit sharing plans, plaintiffs Defined Benefit Plan and Trust (Jest Plan), Cajoeco LLC Profit Sharing Plan (Cajoeco Plan), and Cajoeco LLC Profit Sharing Trust (Cajoeco Trust).
>
> …
>
> Norman was solely responsible for directing the investments and loans at issue in this litigation and he used, in part, funds taken from his companies' plans. He had no experience in owning or operating restaurants.
>
> The investments at issue arose from Norman's relationship with his friend John. The two became friends through Norman's frequenting of a restaurant that John owned and operated with others between 1983 and 2004.
>
> In 2004, John sought to expand his businesses by forming defendant Bensi Enterprises, LLC (Bensi Enterprises) and soliciting investors through a Private Placement Memorandum (PPM).  Bensi Enterprises sought to raise $4.5 million by offering for sale 30,000 units of Class B membership interests at $150 per unit seeking to raise a total of $4.5 million.  About $3 million was ultimately raised through sale of the Class B units.  The PPM contained explicit warnings about the risk of investing in Bensi Enterprises, including the loss of all investment funds.  The PPM recommended investors perform their own investigations and evaluations of the investment, including consulting with legal, financial, and accounting advisors.  At all times, as the majority holding Class A member and Managing Member of Bensi Enterprises, John controlled the business.

> Because he trusted John, in August 2004, without reading the PPM or Bensi Enterprise's operating agreement, Norman made an initial investment of $210,000 into Bensi Enterprises, purchasing 1,400 Class B units. Later, Bensi Enterprises offered new Class AA units at $115 per unit to Class B members on a pro rata basis, seeking to raise an additional $3,450,000. On March 9, 2007, Norman purchased 1,500 Class AA units, investing an additional $172,500 in Bensi Enterprises.
>
> Norman invested without seeking any independent legal or financial advice, understanding there was a "high degree of risk of loss." Moreover, he understood that John would be in charge and make the ultimate decisions for the business. Also, Norman did not rely upon any representations made by anyone else, including any of the other individual defendants. He relied only on his conversations with John.
>
> After the 2004 investment, Bensi Enterprises opened new Bensi restaurants in multiple locations. John managed each of the restaurants through his company, defendant Bensi Restaurant Group, Inc. (BRG). John was BRG's sole shareholder and President. In exchange for these services, each restaurant was required to pay BRG a management fee.
>
> In 2007, John decided to open larger Bensi restaurants in "lifestyle shopping centers." The investment model for these restaurants was different than that used for those owned by Bensi Enterprises. Each of these restaurants was to be a separate entity, owned directly by investors, with John being the majority owner and manager of each entity. Bensi Enterprises had no ownership interest in these second-generation Bensi restaurants.
>
> Norman made initial investments totaling approximately $1,632,500 in these new Bensi restaurants, again relying solely on his conversations with John and without reviewing any documents or seeking professional advice. Between 2008 and 2014, and again without reading any documents or consulting with anyone but John, Norman made additional loans of $560,000 to John and approximately $345,000 to specific Bensi restaurants. All the loans were undocumented, unsecured, and based on "handshake" agreements.

*Cajoeco II*, 2021 WL 2472382, at *1-2 (internal citations and quotations omitted).

Inevitably, Mais's prior litigation position described above looms over what plaintiffs now press—that Schreiber's actuarial services during the Bensi investments period amounted to "investment advice." (*See* Reply Br. at 9). Accepting this contention would contradict the central theme of the Bensi litigation: that Norman Mais "did not rely upon any representations

17

made by anyone else" and "invested *without seeking any independent legal or financial advice*[.]" *Cajoeco II*, 2012 WL 2472382, at *2.

To be clear, plaintiffs here are not disavowing that Mais wanted to and did invest in Bensi and lost a lot of money. They are not asserting facts that contradict the description of how deliberately (one could say heedlessly) Mais made those investments that is set forth in *Cajoeco II*. Instead, they appear to be drawing a line all around what these defendants did in conjunction with the plan funds that Mais used for those investments so as to place defendants in the circle of responsible parties. Plaintiffs seek to transform defendants' plan services—their technical knowledge about how to make and report the Bensi investments as required under ERISA, and Mais's interactions with them when he invested funds into Bensi—into legally actionable activities. To make that case, plaintiffs need to satisfy all of the five factors set forth by the DOL as necessary to support a finding of fiduciary status. The record before this Court, and the scenario set forth in the state lawsuit against Bensi that plaintiffs lost, are both wholly incompatible with such a showing. Neither establishes what is required—*i.e.*, that these defendants rendered advice to the plan as to the value of securities or other property, or made recommendations as to the advisability of investing in, purchasing, or selling securities or other property on a regular basis pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan; that such services would serve as a primary basis for investment decisions with respect to plan assets; and that such person would render individualized investment advice to the plan based on the particular needs of the plan.

On the foregoing examination of the facts adduced here and in context, the Court finds that plaintiffs have failed to show defendants acted as investment advice fiduciaries.

\* \* \*

In light of the foregoing, the Court finds that plaintiffs have not established that defendants exercised discretion with respect to the Cajoeco Plan or otherwise provided them with investment advice such that they can be considered ERISA "fiduciaries." Having so concluded, the Court need not reach defendants' secondary argument that Section 404(c) of ERISA bars plaintiffs' breach of fiduciary duty claim. *See* 29 U.S.C. § 1104(c)(1)(A)(ii) ("In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account . . . no person *who is otherwise a fiduciary* shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control[.]" 29 U.S.C. § 1104(c)(1)(A)(ii) (emphasis added). Defendants' motion for summary judgment is granted.

   c. **Defendants' Counterclaim**

Defendants have asserted a counterclaim against plaintiffs, alleging in three short paragraphs that: (i) plaintiffs were fiduciaries of the Cajoeco Plan, (ii) they were responsible for investing plan assets, and (iii) they negligently selected the Bensi investments. (D.E. 13 at 10, ¶¶ 1-3.) Plaintiffs filed an answer admitting that they are fiduciaries of the Cajoeco Plan and that they were responsible for selecting plan investments but denying any allegations of negligence. (D.E. 16.) The parties did not address the counterclaim in their briefs or during oral argument. The prayer for relief ("**WHEREFORE**, Defendants demand judgment dismissing the Complaint, awarding them judgment on their Counterclaim, and awarding such other and further relief as is just and proper") is, as are the pleadings in the counterclaim, unmoored to anything other than a dismissal of the complaint. Faced with the parties' omission of argument or authority with

19

respect to the sufficiency of the counterclaim or the appropriateness of granting it, the Court dismisses it for mootness and failure to state a claim.

## V. Conclusion

For the foregoing reasons, defendants' motion for summary judgment (D.E. 67) is granted and this lawsuit, including defendants' counterclaim, is dismissed. An appropriate order will issue.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Date: August 31, 2022